Rel: 12/12/14

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2014-2015

———————————————

### 1130758

———————————————

Sarah Grimes

v.

Kristen Saban

**Appeal from Tuscaloosa Circuit Court**
**(CV-12-900538)**

BRYAN, Justice.

Sarah Grimes appeals a summary judgment entered by the Tuscaloosa Circuit Court in favor of Kristen Saban in Grimes's civil action against Saban seeking damages for assault and battery. Viewing the evidence in the light most favorable to Grimes, the nonmovant, as we must when reviewing a summary

judgment, we conclude that there are genuine issues of material fact in this case. Therefore, we reverse the summary judgment and remand the cause for further proceedings.

## Facts and Procedural History

In the early morning hours of August 29, 2010, Grimes, Saban, and others were gathered in the kitchen at Saban's apartment after returning from Rounders, a bar located in Tuscaloosa. Both Saban and Grimes had been drinking alcohol. At one point, Grimes offended Saban by telling her to "shut up" and saying that Grimes and the others were tired of listening to her. Saban went to her bedroom and, according to Grimes, as she did so, Saban shouted that no one liked Grimes and that Grimes did not have any friends. Grimes told Saban that Saban needed to get therapy, to which Saban replied: "Because that worked really well for you." According to Saban, Grimes then called Saban a "psycho."

Saban locked herself in her bedroom. Some time later, Hannah Muncher went to Saban's bedroom to check on her. Saban let Muncher into her bedroom and locked the door behind her. Grimes, McKinnon Moultrie, and Courtney Reigel, one of Saban's

roommates, were all sitting in Reigel's bedroom, which was across the hall from Saban's bedroom.

While Saban was locked in her bedroom, she posted the following statement on her Facebook social-medium page: "No one likes Sarah, Yayyyyy!" When Grimes saw the Facebook post, she got up and moved toward Saban's door, saying "I'm done." Reigel told Grimes not to confront Saban. Grimes replied: "[I]f she touches me, I'll kill her." Grimes testified that this statement was a figure of speech, that it was not a threat directed at Saban, and that she did not know whether Saban even heard it. Grimes went to Saban's door, with her telephone in her hand, and began banging on the door with her hand, shouting to Saban to remove the post from her Facebook page.

A few seconds later, Saban opened the door and showed Grimes her telephone, stating that she had removed the post. A physical altercation ensued. The facts as to how the altercation began and the extent of it are disputed. Grimes testified that Saban came out of her bedroom to show Grimes that she had removed the post and that Grimes replied "something to the effect of, okay, that's fine, we're done,

and ... called [Saban] crazy." According to Grimes, Saban then "used both of her hands and shoved [Grimes] into [Reigel's] open door frame" and that Grimes "hit [her] head on the door when [Saban] threw [her] back." Grimes testified that she then put "[o]ne hand on [Saban's] throat, one hand on her chest, and threw her back ... toward the door to get her away." Grimes testified further that "immediately after [she] threw [Saban] back [Saban] start[ed] punching [her]" in the face. Grimes testified that Saban hit her in the face more than five times and that Grimes "did not swing back" but put her arm up to defend herself.

The two women were eventually separated. Grimes testified that, after they were separated, Saban threw Grimes's telephone against the wall and went into her room. Grimes followed her to talk to her. Grimes testified that she was bleeding and that blood was "all over the floor and all over [her]" and that it had run down her face and into her bra. Grimes testified that Saban was not bleeding. After a brief conversation with Saban, Grimes determined that she needed to go the hospital. Reigel and Beth Terry, another of Saban's roommates, drove her there and stayed with her until

4

1130758

Grimes's parents arrived. She testified that her injuries were "extensive," including considerable swelling on her left temple and a black eye.

Saban, on the other hand, testified that after she put the post about Grimes on Facebook:

"[Grimes] came banging on my door.

"....

"She banged on my door for a few seconds, maybe almost a minute. I wasn't answering the door. I didn't want to until I -- she was screaming at me to take it off and cursing, and I finally took it off, and I opened the door, and I showed her. I had my phone out, and I said, 'It's off. It's off.'

"....

"And then she took both of her hands and put them around my throat.

"....

"I believe we both had a hold of each other's hair at that point after she grabbed me."

Saban went on to testify that after Grimes grabbed her throat there was "[j]ust a lot of slapping and punching, not many landing, and scratching." Saban testified that she had not touched Grimes before Grimes "put her hands on [Saban's] neck" and that, when Grimes had her hands on Saban's neck, Saban "put[] [her] arms out to try to push [Grimes] off of [her]."

5

Saban testified that Terry pulled Saban and Grimes apart and that she, Saban, went back to her bedroom, crying. Saban testified that her nose was bleeding and that she had scratches on her back. She did not remember seeing any blood on Grimes, but she did testify that Grimes's eye was a little swollen. Saban testified that Grimes said she needed to go to the hospital to document her injuries.

In June 2012, Grimes sued Saban, alleging assault and battery. Grimes argued, among other things, that, "[a]s a result of the beating and the head injuries [she] sustained by Kristen Saban, [Grimes] has had repeated night terrors, anxiety, physical trembling, fears of dying from brain injuries, trouble sleeping, and intrusive recollections of the event." Grimes also alleged that her migraine headaches had increased since the altercation with Saban, that she sustained "severe emotional trauma," and that "the middle of [Grimes's] nose was deformed, was shifted, and it was a direct result of the beating that [Grimes] received from [Saban]."

Saban moved the circuit court to dismiss the action, pursuant to Rule 12(b)(6), Ala. R. Civ. P., and shortly thereafter filed an answer to the complaint. Saban argued,

among other things, that "Grimes instigated, or otherwise brought on this altercation by uttering hateful words to [Saban]" and that "Saban acted in self defense." On July 18, 2012, the circuit court denied Saban's motion to dismiss. In December 2013, Saban moved the circuit court for a summary judgment. She included with her motion, among other things, affidavits from Reigel, Moultrie, Muncher, Terry, and Meaghan Williams, who had also been at the apartment on the morning of August 29, 2010, giving their account of events related to Grimes's and Saban's altercation. Grimes opposed the summary-judgment motion and attached, among other items, as evidence in support of her arguments in opposition the deposition testimony of Grimes and Saban; photographs that Grimes alleged were of the injuries she received during the altercation with Saban; and medical records from Grimes's hospital visit after the altercation. Saban moved to strike those exhibits. The circuit court did not rule on Saban's motion before it entered a summary judgment in Saban's favor on the assault and battery claims.

In its summary-judgment order, the circuit court stated:

"Findings

1130758

"In the early morning hours of August 29, 2010, [Grimes] and [Saban], along with some mutual girlfriends, returned to [Saban's] apartment after a night of socializing at a local bar. As they sat in the kitchen discussing the night's events, an argument ensued between [Grimes] and [Saban], which prompted [Saban] to leave the room, go upstairs to her bedroom, and lock her door.

"While in her room, [Saban] posted on Facebook, 'No one likes Sarah, yayyyyy!' apparently in reference to [Grimes]. Sometime later, [Grimes] saw this post, became angry, went to [Saban's] bedroom and began yelling and pounding on the locked door, demanding the post be removed. When [Saban] opened the door to her bedroom and attempted to show [Grimes] her phone and that the post had been removed, [Grimes] advanced toward [Saban], got within inches of [Saban's] face, and continued yelling. As [Saban] pushed [Grimes] away, [Grimes] grabbed [Saban] by the throat, and the physical altercation began.

"Conclusions

"[Saban] was in her home, locked in her bedroom, when [Grimes] sought out [Saban] and initiated the confrontation. [Grimes's] response to [Saban's] Facebook post was unreasonable and excessive. [Grimes] initiated the confrontation when she sought out [Saban] after [Saban] had left the room where the argument had taken place, and by going to [Saban's] locked bedroom door yelling and demanding the post be taken down. When [Saban] opened the door to an angry [Grimes] within inches of her face, it was reasonable for [Saban] to believe imminent use of unlawful physical force by [Grimes] was about to be used against her. [Saban] had a right to be in her home, had no duty to retreat and had the right to stand her ground. Therefore, [Saban] was justified in using physical force to defend herself from what she reasonably believed to be the use of

8

unlawful physical force by [Grimes]. Furthermore, [Saban] was justified in using a degree of force that she reasonably believed was necessary to repel [Grimes's] use and threat of physical force.

"Due to these facts, Alabama Code [1975,] § 13A-3-23[,] presumes that [Saban's] actions were justified and necessary to repel the use of physical force against her. [Grimes] failed to present evidence to rebut this presumption. Therefore, it is ORDERED, ADJUDGED AND DECREED that [Saban's] Motion for Summary Judgment is hereby GRANTED with costs taxed as paid."

(Capitalization in original.)

Grimes moved the circuit court to alter, amend, or vacate its judgment. The circuit court denied that motion on March 18, 2014, and Grimes appealed.

## Discussion

"'The standard of review applicable to a summary judgment is the same as the standard for granting the motion ....' McClendon v. Mountain Top Indoor Flea Market, Inc., 601 So. 2d 957, 958 (Ala. 1992).

"'A summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. The burden is on the moving party to make a prima facie showing that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. In determining whether the movant has carried that burden, the court is to view the evidence in a light most favorable to the nonmoving party and to draw all reasonable

9

> inferences in favor of that party. To defeat a properly supported summary judgment motion, the nonmoving party must present "substantial evidence" creating a genuine issue of material fact -- "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." Ala. Code 1975, § 12-21-12; West v. Founders Life Assurance Co. of Florida, 547 So. 2d 870, 871 (Ala. 1989).'"

Pritchett v. ICN Med. Alliance, Inc., 938 So. 2d 933, 935 (Ala. 2006) (quoting Capital Alliance Ins. Co. v. Thorough-Clean, Inc., 639 So. 2d 1349, 1350 (Ala. 1994)).

Grimes argues that the circuit court erred in entering a summary judgment in favor of Saban because, she says, genuine issues of material fact exist as to whether Saban acted in self-defense, under § 13A-3-23, Ala. Code 1975. Section 13A-3-23 provides, in pertinent part:[1]

> "(a) A person is justified in using physical force upon another person in order to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he or she may use a degree of force which he or she reasonably believes to be necessary for the purpose. ...
>
> "....

---

[1]Section 13A-3-23 was amended effective August 1, 2013. That amendment affected parts of § 13A-3-23 not quoted above.

10

1130758

"(b) A person who is justified under subsection (a) in using physical force, including deadly physical force, and who is not engaged in an unlawful activity and is in any place where he or she has the right to be has no duty to retreat and has the right to stand his or her ground.

"(c) Notwithstanding the provisions of subsection (a), a person is not justified in using physical force if:

"....

"(2) He or she was the initial aggressor, except that his or her use of physical force upon another person under the circumstances is justifiable if he or she withdraws from the encounter and effectively communicates to the other person his or her intent to do so, but the latter person nevertheless continues or threatens the use of unlawful physical force.

"....

"(d) A person who uses force, including deadly physical force, as justified and permitted in this section is immune from criminal prosecution and civil action for the use of such force, unless the force was determined to be unlawful."

The circuit court determined that Grimes "sought out [Saban] and initiated the confrontation"; that Saban "was justified in using physical force to defend herself from what she reasonably believed to be the use of unlawful physical force by [Grimes]"; and "that [Saban's] actions were justified

11

and necessary to repel the use of physical force against her."
These conclusions were apparently based on the circuit court's
findings that, after she saw Saban's Facebook post about her,
Grimes

> "became angry, went to [Saban's] bedroom and began
> yelling and pounding on the locked door, demanding
> the post be removed. When [Saban] opened the door
> to her bedroom and attempted to show [Grimes] her
> phone and that the post had been removed, [Grimes]
> advanced toward [Saban], got within inches of
> [Saban's] face, and continued yelling. As [Saban]
> pushed [Grimes] away, [Grimes] grabbed [Saban] by
> the throat, and the physical altercation began."

These findings are supported by Saban's deposition
testimony and by the affidavits of Reigel, Moultrie, Muncher,
Terry, and Williams, which she attached to her motion for a
summary judgment. However, they are disputed by Grimes's
deposition testimony, which was attached to Grimes's brief
filed in opposition to Saban's summary-judgment motion. As
noted previously,

> "[i]n determining whether the movant has carried
> that burden [of showing that there is no genuine
> issue of material fact and that the movant is
> entitled to judgment as a matter of law], the court
> is to view the evidence in a light most favorable <u>to
> the nonmoving party and to draw all reasonable
> inferences in favor of that party</u>."

<u>Capital Alliance Ins.</u>, 639 So. 2d at 1350 (emphasis added).

Grimes testified in her deposition that after she banged on Saban's door, insisting that Saban take down the Facebook post, Saban opened the door and came out of her bedroom to show Grimes that the post had been removed. Grimes testified that Saban was in the hall when she showed Grimes her telephone and that "[Grimes] had backed away from [Saban's] door when [Saban] came out of her room." Grimes also testified that she and Saban were "in close proximity" and "[c]loser than [arms' length]," but her testimony does not indicate that she was "within inches of [Saban's] face" or that she continued yelling or threatening Saban once Saban told her the post had been removed.[2]

Grimes also testified in her deposition that, after Saban told her that the Facebook post had been removed, she said to Saban "something to the effect of 'I don't care, okay, but we're done,' and I called her crazy." Grimes testified that Saban then "used both of her hands and shoved [Grimes] into [Reigel's] open door frame." Grimes testified that, after Saban pushed her, she grabbed Saban, putting one hand on her throat and one hand on her chest "and threw [Saban] back ...

_____

[2]The statement that Grimes was yelling at Saban "within inches of Saban's face" appears only in Reigel's affidavit.

13

toward the door to get her away." According to Grimes, when she put her hands on Saban's throat and chest to push her away, Saban started punching her and hit her in the face "[m]ore than five times."

Grimes testified that, after the first punch, she told Saban that "[she] was calling the cops." Grimes stated:

"I'm not sure how many blows were after that. I did not swing back. I know I had my arm up to defend myself. She had a grip on my hair. And we were somehow moving along the wall .... [Muncher] at this point ... tried to pull her off, and it wasn't working.

"And at some point, the closer we got towards the living room, [Terry], who was asleep, got up out of bed and they somehow managed to pull [Saban] off of me."

Grimes also testified in her deposition that she may have scratched Saban and pulled her hair to "get away from her and get her off of me."

When viewed in the light most favorable to Grimes and when all reasonable inferences are drawn in favor of Grimes, see Pritchett, supra, Grimes's deposition testimony raises genuine issues of material fact as to whether Saban reasonably believed the use of force was necessary to defend herself against Grimes, whether Saban used a degree of force she

reasonably believed was necessary, and whether Saban was the initial aggressor in the altercation. See § 13A-3-23(a) and (c)(2), supra. Thus, Saban was not entitled to a summary judgment pursuant to § 13A-3-23 on the ground that she acted in self-defense.

Saban argues that Grimes's deposition testimony alone is not "substantial evidence" creating a genuine issue of material fact as to whether Saban acted in self-defense. She cites Blackburn v. State Farm Automobile Insurance Co., 652 So. 2d 1140 (Ala. 1994), Mitchell v. Torrence Cablevision USA, Inc., 806 So. 2d 1254 (Ala. Civ. App. 2000), and Walsh v. Douglas, 717 So. 2d 807 (Ala. Civ. App. 1998), in support of that argument. Her reliance on those cases is misplaced.

In Blackburn, this Court noted that the undisputed evidence in the record disproved the plaintiff's claim that the defendant had acted in bad faith. In Mitchell, the Court of Civil Appeals determined that the plaintiff's own testimony supported the defendants' claim that there was no genuine issue of material fact as to their affirmative defenses. Here, the evidence related to Grimes's assault and battery claims and Saban's claim that she acted in self-defense is

15

highly disputed and raises genuine issues of material fact as to whether Saban is entitled to protection under § 13A-3-23.

In Walsh, the Court of Civil Appeals concluded that the "unsupported allegations" in the testimony of one of the defendants "[did] not constitute substantial evidence" and that that testimony "was insufficient to create a factual issue precluding summary judgment." 717 So. 2d at 810. The Court of Civil Appeals stated: "Mere conclusory allegations that a fact exists will not defeat a properly supported summary judgment motion." Id. Grimes's deposition testimony, however, is not composed of "[m]ere conclusory allegations." Instead, she sets forth specific facts that, when viewed in the light most favorable to Grimes, as they must be, see Pritchett, supra, constitute substantial evidence of genuine issues of fact as to whether Saban acted in self-defense, pursuant to § 13A-3-23, see Rule 56, Ala. R. Civ. P., i.e., evidence from which "fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." Pritchett, supra. Thus, the circuit court erred in entering a summary judgment in Saban's favor based on § 13A-3-23. In so holding, we should not be

16

1130758

understood as expressing a view as to the merits of the underlying claims or affirmative defenses; we merely hold that there remain genuine issues of material fact for resolution by the fact-finder so as to preclude the entry of a summary judgment.

## Conclusion

In light of the foregoing, we reverse the circuit court's judgment and remand the cause for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

Moore, C.J., and Bolin, Parker, and Main, JJ., concur.

17